IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BRENDA SUE THOMAS                                                    PLAINTIFF

v.                              Civil No. 05-5087

JO ANNE B. BARNHART,
Commissioner, Social
Security Administration                                             DEFENDANT

## MEMORANDUM OPINION

Brenda Sue Thomas (hereinafter "Plaintiff"), appeals from the decision of the

Commissioner of the Social Security Administration (hereinafter "Commissioner"), denying her

applications for a period of disability and disability insurance benefits (hereinafter "DIB"),

pursuant to *§§ 216(i) and 223* of Title II of the Social Security Act (hereinafter "the Act"), *42*

*U.S.C. §§ 416(i) and 423*.

Plaintiff, whose date of birth is February 8, 1962, was 42 years of age at the time of the

August 19, 2004 administrative hearing (T. 257, 247-292). Plaintiff has a 10th grade education

(T. 70, 76, 96). While in school, Plaintiff attended regular classes rather than special education

classes (T. 76, 96). Plaintiff's past relevant work includes the following jobs: clerk; waitress;

veterinary assistant; factory job - manufacturing of baby wipes; cashier; delivery person; and,

cook (T. 78).

Plaintiff alleges an inability to work due to: post herpetic neuralgia; pain in head and

face; fatigue; hypothyroidism; a blood disorder, polycythemia vera; disc bulge at L5-S1; allergic

rhinitis; chronic asthmatic bronchitis; insomnia; inability to concentrate; hypercholestrolemia;

anxiety; sensitivity to temperature extremes; arthralgias of the hands and feet; profilactic breast

cancer treatment with Tamixofen; side effects of medications; and, headaches. She protectively

filed her application for benefits, alleging an onset of date of disability of November 7, 2002 (T. 51-53).

The Social Security Administration denied plaintiff's application initially and on reconsideration. Plaintiff then requested and received a hearing before an Administrative Law Judge (hereinafter "ALJ"), which hearing was held on August 19, 2004, before ALJ Dean C. Metry in Fayetteville, Arkansas (T. 247-292). The ALJ rendered a decision adverse to Plaintiff on September 21, 2004 (T. 19-26).

The Plaintiff then petitioned the Appeals Council for review on November 22, 2004 (T. 7-10). The Appeals Council denied review on March 16, 2005 (T. 3-6), thus making the ALJ's decision the final decision of the Commissioner. Plaintiff now seeks judicial review of that unfavorable decision (Doc. #1, 8). This matter is before the undersigned by consent of the parties (Doc. #4).

**Applicable Law:**

Our role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See *Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)*. Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id.* In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. See *Craig v. Apfel, 212 F.3d 433, 436 (8th Cir.2000)*. As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, see *id.*, or because we would have decided the case

-2-

differently.  See *Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993).*

The Commissioner has established, by regulation, a five-step sequential evaluation for determining whether an individual is disabled.

The first step involves a determination of whether the claimant is involved in substantial gainful activity.  *20 C.F.R. § 416.920(b).*  If the claimant is so involved, benefits are denied; if not, the evaluation goes to the next step.

Step two involves a determination, based solely on the medical evidence, of whether claimant has a severe impairment or combination of impairments.  *Id., § 416.920(c); see 20 C.F.R. § 416.926.*  If not, benefits are denied; if so, the evaluation proceeds to the next step.

The third step involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling.  *Id., § 416.920(d).*  If so, benefits are awarded; if not, the evaluation continues.

Step four involves a determination of whether the claimant has sufficient residual functional capacity, despite the impairment(s), to perform past work.  *Id., § 416.920(e).*  If so, benefits are denied; if not, the evaluation continues.

The fifth step involves a determination of whether the claimant is able to perform other substantial and gainful work within the economy, given the claimant's age, education and work experience.  *Id., § 404.920(f).*  If so, benefits are denied; if not, benefits are awarded.

In addition, whenever adult claimants allege mental impairment, the application of a special technique must be followed at each level of the administrative review process.  See *20 C.F.R. § 416.920a(a).*

The Commissioner is then charged with rating the degree of functional limitation, and

-3-

applying the technique to evaluate mental impairments. See *20 C.F.R. § 416.920a(d).*

Application of the technique must be documented by the Commissioner at the ALJ hearing and

Appeals Council levels. See *20 C.F.R. § 416.920a(e).* Such documentation, as referred to

within the regulations, is referred to as the PRT factors, mentioned previously.

**Discussion:**

The ALJ evaluated the plaintiff's claim according to the five-step sequential evaluation

analysis prescribed by the social security regulations. See *20 C.F.R. §§ 404.1520(a)-(f); see*

also *Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987)* (describing five-step analysis). At the first

step, the ALJ found the plaintiff had not engaged in substantial gainful activity since her alleged

onset date of November 7, 2002 (T. 19-26, 51). At the second and third steps, the ALJ

determined that the plaintiff suffered from severe, medically determinable impairments of post

herpetic neuralgia, bulging disc of the lumber spine and polycythemia vera (T. 21), but no

impairment or impairments that meet or equal the level of severity for any impairment listed in

*Appendix 1, Subpart P, Regulations No. 4* (T. 13). See *20 C.F.R. § 404.1521; Bowen v.*

*Yuckert, supra.* At Step 4 of the sequential analysis, the ALJ determined that Plaintiff retained

the residual functional capacity to perform sedentary work with a sit/stand option, and could

return to her past relevant work (T. 23-24). The ALJ made the determination that Plaintiff

"could return to her past relevant work as an order taker as previously performed and as

generally performed in the national economy" (T. 24).

On appeal, Plaintiff makes several arguments. Significantly, Plaintiff raises the issue of

whether the ALJ properly analyzed the Plaintiff's nonexertional impairments. Upon a thorough

review of the administrative record, the undersigned finds that this issue has merit. Here the

AO72A
(Rev. 8/82)

ALJ determined that while it is "reasonable to assume that Plaintiff may experience some

limitations"due to her severe impairments, "post herpetic neuralgia, a bulgind dis co hte lumbar

spine, and polycythemia vera; however-, the degree to which her impairments are functionally

limiting is an issue which is very much open to question." (T. 23).

In determining whether the ALJ properly disregarded Plaintiff's subjective complaints

of pain, the Court must determine if the ALJ properly followed the requirements of *Polaski v.*

*Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)* (subsequent history omitted)*, in evaluating her

pain and credibility.

> The absence of an objective medical basis which supports the degree of severity
> of subjective complaints alleged is just one factor to be considered in evaluating
> the credibility of the testimony and complaints.  The adjudicator must give full
> consideration to all of the evidence presented relating to subjective complaints,
> including the claimant's prior work record, and observations by third parties and
> treating and examining physicians relating to such matters as:
>
>   1. the claimant's daily activities;
>   2. the duration, frequency and intensity of the pain;
>   3. precipitating and aggravating factors;
>   4. dosage, effectiveness and side effects of medication;
>   5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective
> complaints solely on the basis of personal observations.  Subjective complaints
> may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler, 739 F.2d  at 1322 (emphasis in original).*

However, in addition to the requirement that the ALJ consider the Plaintiff's allegations

of pain, he also has a statutory duty to assess the credibility of plaintiff and other witnesses.

*Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992).*  The ALJ may discredit subjective

complaints of pain inconsistent with the record as a whole.  *Ownbey v. Shalala, 5 F.3d 342, 344*

AO72A
(Rev. 8/82)

*(8th Cir. 1993).*

Here, the record is replete with Plaintiff's allegations of numerous nonexertional impairments, including: pain (T. 253, 256, 269, 271, 272, 273, 275, 276, 277, 278, 291, 12, 13, 14, 15, 64, 74, 75, 97, 98, 114, 125, 127, 131, 138, 155, 158, 165, 170, 173, 176, 178, 180, 181, 202, 203, 220, 227, 235); fatigue (T. 263, 268, 277, 278, 97, 76, 114, 120); shortness of breath due to asthmatic bronchitis (T. 264, 198, 199); sensitivity to temperature extremes (T. 95); inability to sleep (T. 269); loss of concentration (T. 273, 279, 74); headaches (T. 269, 272, 64, 98, 158, 131, 165, 169, 170, 173); swelling (T. 127); and, side effects of medication (T. 258, 12, 97, 175, 176, 178).

In finding Plaintiff's alleged level of pain to be less than fully credible, the ALJ found that "....in May 2003, Dr. Travis stated that Tamoxifen was doing an 'excellent job' at controlling her pain (exhibit 3F)" (T. 23). Such a finding is inconsistent with the evidence of record as well as the pharmacology of Tamoxifen.

Tamoxifen, also known by the brand name Noldavex, is a drug not set forth within the PDR in detail. The sole PDR reference to Tamoxifen appears as follows in its entirety:

NOLVADEX
[tamoxifen citrate]

Please visit www.NOLVADEX.com or call the AstraZeneca Information Center at 1-800-236-9933 for the most current full prescription information.
  *Shown in Product Identification Guide, page 306.*

However, when the referenced web page is viewed on the internet, the following information may be obtained:

**About NOLVADEX**

-6-

NOLVADEX® (tamoxifen citrate) Tablets work by blocking estrogen. In breast tissue, NOLVADEX is an antiestrogen. An antiestrogen or estrogen blocker works by blocking estrogen in breast tissue. While estrogen may not actually cause breast cancer, it may stimulate its growth, feeding the cancer. With estrogen blocked, the cancer cells that need it may not grow at all. In other words, antiestrogens may keep cancer from developing in your breast.

NOLVADEX was initially developed to *treat* advanced breast cancer. NOLVADEX has been successfully helping save the lives of millions of women *with* breast cancer for over 20 years.

Today, NOLVADEX is used to treat breast cancer. Nolvadex is not indicated for the treatment of premenopausal, node positive patients. Because it can delay or stop the growth of breast cancer cells, it's also a welcome option for the management of ductal carcinoma in situ (DCIS) following surgery and radiation. If you've had a breast biopsy and are unsure if your outcome might have been DCIS, it's now vital to speak with your doctor again.

**Important safety information for NOLVADEX.**

**In clinical trials it has been shown that cancer of the uterus, stroke, and blood clots can occur approximately 2 to 4 times more frequently with NOLVADEX than placebo, but each occurred in less than 1% of women. Some of these strokes, blood clots, and uterine cancers were fatal.**

**For most women with breast cancer, the benefits of NOLVADEX outweigh its risks. If you are taking NOLVADEX to reduce your risk of developing breast cancer because you are at high risk or have DCIS, you should discuss these warnings with your healthcare provider.**

**Women who are pregnant or plan to become pregnant should not take NOLVADEX**. Women who have a history of blood clots or who currently use anticoagulants to thin their blood should not take NOLVADEX to reduce their risk of breast cancer. Cataracts and cataract surgery can also occur more frequently with NOLVADEX . The most frequently reported adverse reactions with NOLVADEX were hot flashes and vaginal discharge.

Nolvadex Tamoxifen Citrate, Astra Zenica, About the Drug, About Nolvadex, (visited June 13, 2006) http://www.nolvadex.com/consumer/nolvadex.asp (emphasis in original).

The full prescribing information can be obtained from the website as well.  However, a

AO72A
(Rev. 8/82)

review of the full prescribing information indicates that Tamoxifen Citrate is not used as a pain medication, but rather in the treatment and prevention of breast cancer as an estrogen blocker. Due to the wide availability of generic Tamoxifen Citrate, Astro Zenica has made the following announcement:

> AstraZeneca has made the decision to discontinue the commercial manufacture and distribution of branded NOLVADEX® (tamoxifen citrate) Tablets in the United States by June 2006.
> Once commercial supplies are exhausted, patients will no longer be able to obtain brand name NOLVADEX Tablets. This applies to both new prescriptions and refills.
> Currently there are numerous companies that manufacture generic tamoxifen in the United States. This is one of the reasons why AstraZeneca has voluntarily decided to cease manufacturing NOLVADEX.
> With the wide availability of generic tamoxifen, the discontinuation of NOLVADEX should in no way affect access to this medication.
> In addition, when the manufacture and commercial distribution of NOLVADEX Tablets is discontinued in June 2006, NOLVADEX will no longer be available within the AstraZeneca Foundation Patient Assistance Program.
> Should you have any questions, please contact the AstraZeneca Cancer Support Network at 1-866-992-9276, Monday through Friday, 9 AM to 8 PM EST.

Nolvadex Tamoxifen Citrate, (visited June 13, 2006), http://www.nolvadex.com).

> Within his decision, the ALJ found:

> ...in May 2003, Dr. Travis stated that Tamoxifen was doing an "excellent" job of controlling her pain (Exhibit 3F).

(T. 23).

Despite an thorough review of the record , the undersigned is unable to locate any portion to Dr. Travis' notes which contain a statement to the effect that Tamoxifen is being used to treat pain. Although the ALJ does not specify to which date in May of 2003 he refers, Plaintiff saw Dr. Travis on both May 7, 2003, and May 21, 2003. The pertinent portions of Dr.

-8-

Travis' treatment notes from May of 2003 are as follows:

> Date: **05/21/2003**
>
> This patient is seen for diagnosis of polycythemia.
>
> Polycythemia vera
>
> Interval History
>
> Brenda presents to clinic today. ***Dr. Kaplan* is doing an excellent job of controlling her pain**....

(T. 160)(emphasis added).

> Date: 05/07/2003
>
> This patient is seen for her diagnosis of polycythemia vera, polycythemia.
>
> Polycythemia vera
>
> Polycythemia
>
> Date of Diagnosis: 08/15/2001
>
> Completed Treatment Details
>
> Completed Treatment: No.
>
> Interval History
>
> Ms. Thomas presents to clinic today for follow up. She has been on tamoxifen and was feeling better, having fewer headaches while she was on tamoxifen and now is having more headaches off tamoxifen. We will plan to get her in to see Dr. Kaplan and then try to do some investigation and **figure out why tamoxifen would be the culprit as far as her headaches go.**
>
>                                        \*\*\*
>
> Clinical Impression and Plan
>
> Return to clinic in two weeks. She is going to try some of her sister['s] tamoxifen to **try and confirm that the tamoxifen is the *problem***, and then we will go from there.

(T. 158-159)(emphasis added).

According to the record, Dr. Kaplan treated Plaintiff on: November 15, 2001; May 14, 2003; June 11, 2003; July 10, 2003; July 18, 2003; August 12, 2003; January 12, 2004; and, September 12, 2004 (T. 175, 176, 177, 178, 180, 181-182, 220). Therefore, Dr. Kaplan saw

AO72A
(Rev. 8/82)

Plaintiff twice, November 15, 2001, and 18 months later on May 14, 2003, some 7 days prior to Dr. Travis' above cited observation of May 21, 2003 (T. 158-159). When he saw Plaintiff, Dr. Kaplan prescribed a number of different medications for plaintiff in his search for a medication which would provide her relief without serious side effects (T. 220, 126-128, 176-182). Plaintiff reported experiencing side effects on a number of occasions (T. 258, 12, 97, 175, 176, 178). Plaintiff's prescribed medications for treatment of her pain included: Hydrocodone; Vicodin; Neurontin; Tramadol; Carbatrol; and Trileptol. Other medications prescribed for plaintiff include: Tamoxifen; Paxil; Syndroid; Tegretol; Albuterol; Lipitor; Flonase; Prednisone; Levaquin; Zyrtec; Atrovent; Biaxin XL; Advair; Guafenesin; Amoxicillin; Claritin; Corticosteroid for Spinal Stenosis; Corticosteroid for used for treatment of pain; and, Decadron (T. 233).

As mentioned previously, in addition to her reports of pain (T. 253, 256, 269, 271, 272, 273, 275, 276, 277, 278, 291, 12, 13, 14, 15, 64, 74, 75, 97, 98, 114, 125, 127, 131, 138, 155, 158, 165, 170, 173, 176, 178, 180, 181, 202, 203, 220, 227, 235), the record also reveals that Plaintiff reported experiencing a number of other nonexertional impairments, such as fatigue (T. 263, 268, 277, 278, 97, 76, 114, 120), shortness of breath due to asthmatic bronchitis (T. 264, 198, 199), sensitivity to temperature extremes (T. 95), inability to sleep (T. 269), loss of concentration (T. 273, 279, 74), headaches (T. 269, 272, 64, 98, 158, 131, 165, 169, 170, 173), swelling (T. 127). Plaintiff also had a lengthy treatment period of asthmatic bronchitis and sinusitis which involved shortness of breath and the various pulmonary medications listed above (T. 195-219). Plaintiff also reportedly experienced a variety of side effects of different medications prescribed to her over the years. (T. 258, 12, 97, 175, 176, 178). Plaintiff's

-10-

AO72A
(Rev. 8/82)

physicians continued to prescribe medications for Plaintiff's nonexertional impairments, and often changed her medications in an effort to alleviate the side effects she experienced. Yet, the ALJ overlooked many of the other nonexertional impairments alleged in the record.

To determine whether the ALJ properly applied the factors listed in *Polaski*, we must determine whether the ALJ took into account all the relevant evidence, and whether that evidence contradicted the claimant's own testimony so that the ALJ could discount the testimony for lack of credibility. *Benskin v. Bowen*, *830 F.2d 878, 882 (8th Cir.1987)*. The ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, *862 F.2d 176, 179 (8th Cir.1988)*.

In this case, with respect to subjective allegations and nonexertional limitations, the ALJ found plaintiff's allegations not supported by credible facts (T. 23). Implicit in the ALJ's task of making a credibility determination is the requirement that he "discuss" the *Polaski* factors. *Herbert v. Heckler*, *783 F.2d at 130* (the *Polaski* cases and the Social Security Disability Reform Act of 1984 require that the Commissioner set forth the inconsistencies in the objective medical evidence presented and discuss the factors set forth in the *Polaski* settlement when making "credibility" determinations concerning claimant's subjective complaints of pain).

Here, the ALJ fails to meaningfully examine the *Polaski* factor of dosage and side effects of medication, particularly the chemotherapy drugs at issue. *See Polaski v. Heckler*, *739 F.2d at 1321-22*. The ALJ must discuss and point out the inconsistencies in the record, in order to make a credibility determination. *Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir.1991)* ("it is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies

-11-

AO72A
(Rev. 8/82)

in the evidence presented and discuss the factors set forth in *Polaski* when making credibility determinations"); *Herbert v. Heckler*, *783 F.2d at 131* (even though evidence with respect to *Polaski* factors is in the record, those factors must be discussed in the decision). Likewise, allegations of fatigue must be discussed and analyzed, applying the standards that relate to the similar, subjective complaint of pain. *Jackson v. Bowen, 873 F.2d 1111, 1114 (8th Cir. 1989).* Here, the ALJ's *Polaski* analysis is not sufficient to comply with the dictates of the case law. The ALJ failed to conduct a *Polaski* analysis of Plaintiff's fatigue, swelling, side effects, sensitivity to temperature extremes or shortness of breath. This is error.

Additionally, Plaintiff raises the question of whether the ALJ properly considered Plaintiff's alleged lack of financial resources with which to obtain medication and treatment (Doc. #8, pp. 24-31). Upon a thorough review of the evidence, the undersigned finds this argument persuasive. Generally, if a claimant does not follow a prescribed treatment plan without a good reason, he or she will not be found disabled. *20 C.F.R. § 416.930(b) (1984).* However, the lack of financial resources to pay for medical treatment and/or medication may justify the failure to pursue treatment or follow a treatment plan. *Brown v. Heckler 767 F.2d 451, 452 (8th Cir.1985);Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir.1984).* The ALJ does not discuss the impact of plaintiff's alleged lack of finances on her ability to access treatment or obtain prescribed medication. This constitutes error. To the extent the ALJ found plaintiff not entirely credible, due to a lack of medical treatment and/or prescription medication, we note numerous record citations in which the Plaintiff testified to and otherwise reported her lack of financial means. The record reflects through the medical evidence, the testimony and/or other reports Plaintiff had no income and no money with which to: obtain prescription medication

-12-

(T. 97, 175, 182, 201); undergo the recommended MRI study (T. 71, 182); or, see a doctor (T. 254, 281). Although she applied for Medicaid coverage, Plaintiff had no health insurance coverage to defray the cost of medical treatment and/or prescription medication until December of 2003 (T. 258, 259). She applied for assistance in obtaining her pain medication through a drug assistance program (T. 175). Plaintiff took herself off of her medications or did not fill the prescriptions due to her financial situation (T. 168). Plaintiff's physicians were aware of her financial difficulties, noted same in their treatment records[1], assisted her in applying for aid and provided her with sample medications on a number of occasions (T. 175, 182, 71, 182, 200, 203, 209, 210). Dr. Travis and Dr. Kaplan noted Plaintiff's financial difficulties. Dr. Travis even noted that Plaintiff would take her sister's tamoxifen (T. 159). Despite the numerous allegations of Plaintiff's inability to obtain treatment due to a lack of financial means, the ALJ failed to address this issue when determining that Plaintiff was not credible or disabled.

Certainly, the failure to follow a prescribed course of treatment may be excused by a plaintiff's lack of funds. *Tome v. Schweiker, 724 F.2d at 714.* Likewise, medication or treatment an indigent person cannot afford is no more a cure for her condition than if it had never been discovered. To a poor person, a medicine that she cannot afford to buy does not exist. *Dover v. Bowen, 784 F.2d 335, 337 (8th Cir.1986); Benson v. Heckler, 780 F.2d 16, 18 (8th Cir.1985); Tome v. Schweiker, 724 F.2d at 714.*

Upon remand, the ALJ should conduct a thorough Polaski analysis of Plaintiff's nonexertional impairments and should consider and discuss what effect, if any, Plaintiff's

---

[1]In addition to the other indicators of financial hardship, the fact that Plaintiff's telephone was disconnected was also noted in the record (T. 235). .

-13-

alleged lack of financial means to obtain her prescribed pain medications and to seek/obtain

medical treatment had on the Plaintiff's claim for disability, as well as Plaintiff's credibility.

## Conclusion:

Accordingly, we conclude that the ALJ's decision denying DIB and SSI benefits to the

plaintiff is not supported by substantial evidence and should be reversed.   We further conclude

that this matter should be remanded to the Commissioner for further consideration consistent

with this decision.

ENTERED this 23rd day of June, 2006.

/s/Bobby E. Shepherd
Honorable Bobby E. Shepherd
United States Magistrate Judge

AO72A
(Rev. 8/82)